[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 464.]

WILLIAMS, APPELLEE, *v.* AETNA FINANCE COMPANY, D.B.A. ITT FINANCIAL
SERVICES, APPELLANT.

[Cite as *Williams v. Aetna Fin. Co.*, 1998-Ohio-294.]

*Commercial transactions—Home equity loan from finance company used to fund
home improvement repairs—Consumer stops making payments on loan
when work not completed—Arbitration provision in loan agreement
unenforceable, when—Recovery against finance company under theory of
civil conspiracy upheld, when.*

(No. 97-1670—Submitted May 26, 1998—Decided November 4, 1998.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-960234 and
C-960255.

———————————

{¶ 1} In late November 1989, Christopher Blair came to the home of
plaintiff-appellee Mildred Williams and had a short conversation with her. Blair
told Williams that he had noticed that her house was in need of some repairs.
Williams responded that she was aware repairs were needed, but that she was
unable to get a loan to get the work done. Williams, a sixty-six-year-old widow,
was alone in her home at the time, and did not allow Blair to enter. He told her he
would return later to speak to her again.

{¶ 2} Blair was a pitchman who attempted to convince homeowners to have
work done on their houses. He did not do the work himself, but contracted it out to
others. At the time he solicited Williams to have her house worked on, Blair was
doing business as Homestead Construction Company.

{¶ 3} Blair returned to Williams's house again in either late November or
in early December. Her grandsons were present at the time, so Williams allowed
Blair to enter her home. Blair showed her pictures of what her house could look

like with repairs done to the exterior. Williams, who was interested in what Blair had to say, told him she also needed repairs done on the interior of the house.

{¶ 4} Blair was seeking business in Williams's neighborhood because he knew that there were a lot of elderly people in the area who had owned their homes for a long time, so that many were free of mortgages. He did not know that Williams owned her home free of a mortgage until he talked to her. Once he found out from her that she had built up equity in her house, he was interested in doing business with her. Blair told Williams he could get her a loan to finance the improvements to her house, even though she again told him she had been unable to get a loan in the past to get the needed repairs done.

{¶ 5} Williams signed a contract dated December 1, 1989 with Blair, to have work done on both the interior and exterior of her house, for $11,500. On either December 5 or December 6, an employee of Blair transported Williams to the Loveland, Ohio branch office of defendant-appellant Aetna Finance Company, d.b.a. ITT Financial Services ("ITT"), to obtain a loan to finance the home repairs. Even though another branch office was closer to Williams's home, she was taken to the Loveland branch because Blair frequently referred prospective loan applicants to that branch. The branch manager at Loveland, Tom Scholl, had contacted Blair in early 1988 seeking referrals of loan customers. Blair had been designated an approved "referral source" by ITT, a special status that allowed loan customers referred by Blair to receive preferential handling of their loans based on the fact that they dealt with Blair.

{¶ 6} At her first visit to the ITT Loveland office, Williams agreed to the first of two loan contracts she would make with ITT. She borrowed $3,769.95 at an annual interest rate of 27.4 percent. The loan was secured by Williams's television set and stereo, with the total value of those two items listed as $650. Williams also turned over the title to her 1980 Buick automobile as security on the loan. ITT charged her a total of $155 for a loan origination fee and a recording fee.

2

She was also sold insurance on her television set and stereo, as well as life insurance, for a total of $164.80. Williams was to pay $125 per month for a four-year period on the loan.

{¶ 7} The loan proceeds from this first loan were paid to Williams in two checks, both made payable to her. One check, for $450.15, was for Williams's personal use. The other check, for $3,000, was to be a down payment on the remodeling work. At the ITT office, Williams signed that check over to Blair and gave it to Blair's employee who had transported her there.

{¶ 8} On December 13, 1989, another of Blair's employees brought Williams to the Loveland branch office to do the paperwork to get a larger loan to finance the work on her house. This loan was designed as a debt consolidation loan, and was secured by a mortgage on Williams's real estate. Williams signed a $12,936.64 promissory note at an annual interest rate of 17.81 percent, to be repaid at $190 per month over fifteen years. ITT charged her $1,034.93 for a loan origination fee and points, and also charged Williams $25 for a commitment letter. Williams was charged a total of $417 for the recording fee, title insurance, title search, and appraisal.

{¶ 9} Some of the loan proceeds were to be used to pay off Williams's first loan. The proceeds were also to be used to pay off Williams's outstanding credit card debts of $3,326.04 to Visa, L.S. Ayres, and Sears. The remainder of the proceeds was meant to finance the improvements to her home. Williams did not receive any of the proceeds at this time.

{¶ 10} On December 19, 1989, Williams was again transported to ITT's Loveland office by employees of Blair. At that time, the second loan was finalized. As a result, the earlier loan was paid off and Williams received the proceeds of the second loan, as set up on December 13, in five checks. Four checks, made jointly payable to Williams and the credit card companies, were used to pay off those debts. Another check, for $4,492.12, was made payable to Williams. Williams

endorsed that check at the ITT Loveland office, and gave it to one of Blair's employees.

{¶ 11} At the time these loans were made, Williams's income was either $420 or $430 per month. She was making monthly payments of more than $190 per month on credit card bills and other debts prior to signing the loan agreements with ITT.

{¶ 12} After Blair received payments from Williams via the ITT checks she signed over to him, workers came to her house in late December 1989 and early January 1990 and did some work on the house. However, the workers did only a small part of the work that Williams had agreed with Blair would be done. The work done was not what Williams wanted, and most of the work was never done at all. After starting the work, the workers did not return to finish it. Williams attempted to call Blair numerous times to inquire about the failure of the workers to do the job to her satisfaction, but he never answered her inquiries.

{¶ 13} Williams made two payments on her loan with ITT, and then stopped making payments when it became evident to her that the work would not be finished. In April 1990, she filed suit in the Court of Common Pleas of Hamilton County against, *inter alios*, Christopher Blair, d.b.a. Homestead Construction Company, and ITT. Williams claimed violations of the Ohio Consumer Sales Practices Act ("CSPA") and Ohio Home Solicitation Sales Act ("HSSA"), breach of contract, and civil conspiracy. She sought compensatory damages, attorney fees, costs, and punitive damages. Blair, who eventually went bankrupt, was never served with the complaint. ITT was the only defendant served and became the only defendant against whom recovery was sought.

{¶ 14} ITT filed a motion with the trial court to compel arbitration pursuant to the arbitration clause contained in the loan agreement Williams signed with ITT, and to stay the trial court proceedings pending arbitration. The loan agreement contained a broad arbitration clause providing that any dispute between Williams

and ITT, "other than judicial foreclosures and cancellations regarding real estate security, * * * shall be resolved by binding arbitration."

{¶ 15} Williams opposed ITT's motion primarily on equity grounds, claiming that the arbitration provision was unconscionable, deceptive, and unfair, and therefore unenforceable. The trial court, in a judgment entered on August 13, 1990, denied the motion to compel arbitration without giving a reason for the denial. ITT appealed to the Court of Appeals for Hamilton County, which affirmed the trial court's ruling, finding that Williams's "complaint challenges the existence of a contract between the parties and, therefore, the arbitration clause in the loan agreement may not be enforced until the question of the existence of the contract is resolved." *Williams v. Aetna Fin. Co.* (Aug. 9, 1991), Hamilton App. No. C-900663, unreported, 1991 WL 433751.

{¶ 16} ITT appealed the judgment of the court of appeals to this court, which allowed the discretionary appeal. *Williams v. Aetna Fin. Co.* (1991), 62 Ohio St.3d 1484, 581 N.E.2d 1390. After full briefing and oral argument, this court dismissed the appeal as having been improvidently allowed. (1992), 65 Ohio St.3d 1203, 602 N.E.2d 246.

{¶ 17} On February 26, 1993, ITT moved the trial court for an evidentiary hearing regarding the validity and enforceability of the arbitration provision. The trial court denied the motion, finding that its earlier decision denying arbitration had been affirmed on appeal, and that the motion was repetitious of ITT's earlier motion to compel arbitration.

{¶ 18} A week after the court of appeals' decision upholding the trial court's denial of the motion to compel arbitration, Williams amended her complaint to allege that she was a victim of a scheme of fraudulent misrepresentation. ITT interposed a counterclaim against Williams for her failure to pay on the promissory note. After the trial court denied several pretrial motions by ITT, including a motion for summary judgment, the case proceeded to a jury trial.

{¶ 19} Williams's principal claim at trial was that Blair and ITT collaborated in a scheme to defraud unsuspecting, unsophisticated homeowners, particularly preying on elderly African-Americans, such as Williams, in certain specific low-income neighborhoods. Williams alleged that Blair did not really intend that the work contracted for by these homeowners would be done, and contended that ITT was an integral part of Blair's schemes by supplying the loan money to the homeowners who entered into contracts with Blair, so that Blair would receive the proceeds of the loans. Williams claimed that ITT benefited by making high-interest, low-risk, secured loans and exploited the unsuspecting homeowners, while ITT knew that the work contracted for with Blair would never be done. To support her claims, Williams presented the testimony of other homeowners, who explained their dealings with Blair and ITT. Testimony was also elicited from Blair and from former employees of ITT by Williams to sustain her position.

{¶ 20} Williams presented her situation as typical of the scheme Blair pitched to the homeowners, put on testimony to support her argument that she was targeted by ITT and Blair, and urged through the witnesses presented that she and other homeowners had been victimized by ITT's two-step loan process, whereby ITT first made a small personal loan and then shortly after replaced it with a second large home equity loan, generating extra closing costs and fees. Williams presented circumstantial evidence in an attempt to have the jury draw inferences built on her allegations that ITT made the loan to her with the knowledge that her monthly income was insufficient to make the monthly payments required, and that ITT may have planned to foreclose if she did not make the payments.

{¶ 21} Williams also presented several witnesses who testified that ITT employees were accepting payments directly from Blair to cover loan payments not being made by his home improvement customers whose work was not being done, to show that ITT employees were aware that the work Blair had solicited was not

being completed. Several witnesses testified to the close relationship Blair had with several ITT loan officers, including the branch manager at the ITT Loveland branch where Williams obtained her loans. Testimony also was presented that the term "Blair loan" had taken on a special meaning at several ITT offices prior to the time Williams dealt with ITT, to indicate the peculiar type of problem loans being made to Blair's customers. In addition, an attorney who represented some dissatisfied customers of Blair testified that he had filed a lawsuit against Blair and ITT, among others, in August 1989, and had won a default judgment.

{¶ 22} ITT's principal defense throughout the trial was that Blair was not ITT's agent and that the alleged frauds committed by Blair should not be attributed to ITT. ITT further argued that the home improvement contracts entered into by the homeowners with Blair were separate transactions from the loan agreements signed by the loan applicants and ITT. ITT pointed out that Williams had agreed to accept the loans after full disclosure of the interest rates and payment schedules. ITT also in essence urged that the loans would have been approved by ITT even if Blair had not referred the applicants, and that ITT's loan practices with regard to the loan applicants referred by Blair, including Williams, were no different from its practices with other customers of ITT.

{¶ 23} At the conclusion of the trial, the jury found in favor of Williams on her claims and awarded her $15,000 in compensatory damages and $1.5 million in punitive damages, and found her entitled to attorney fees. In answering interrogatories, the jury specifically found that (1) ITT participated in a conspiracy that damaged Williams, (2) ITT violated the Ohio Consumer Sales Practices Act and thereby damaged Williams, (3) ITT engaged in a fraud that damaged Williams, (4) ITT breached a contract with Williams, and (5) Williams did not breach a contract with ITT. The jury also found in favor of ITT on its counterclaim, and awarded ITT $3,326.04 (the precise amount of credit card debt paid off by Williams using proceeds from her home equity loan from ITT).

**{¶ 24}** After trial, the trial court denied ITT's motions for judgment notwithstanding the verdict, for an order overturning the results of the trial and compelling arbitration, and for a new trial, and entered judgment on the jury's verdict.[1] On Williams's application for attorney fees, the trial court awarded $56,230.

**{¶ 25}** ITT appealed to the Court of Appeals for Hamilton County, and Williams cross-appealed. That court affirmed the judgment of the trial court on the jury's verdict. The determinations of the court of appeals relevant to our consideration here were as follows: (1) The arbitration clause should not now be enforced after a full trial had been held, because to do so would be a "colossal waste of resources," and ITT was not "materially prejudiced" by the denial of its motions to compel arbitration; (2) the trial court erred in allowing Williams to pursue a theory of recovery against ITT based on an agency relationship between Blair and ITT because Blair was not ITT's agent as a matter of law, but ITT was properly

---

1. When the trial court ruled on these motions, it took the opportunity to "point out" the following observations:

> "1) ITT appointed Chris Blair as its 'dealer' and this appointment was made in writing.

> "2) ITT knew that Blair was securing customers for ITT by soliciting elderly, low income customers for home improvements.

> "3) Long before Mildred Williams was solicited, ITT knew that Blair was not doing the home improvement work for which he was paid.

> "4) ITT targeted Mildred Williams' home before Blair made his first contact with her.

> "5) The evidence showed that ITT participated in a collaboration with Blair to enter this home improvement scheme against Mildred Williams.

> "6) ITT received and retained the fruits of Blair's activities when it retained the car title and retained the mortgage on Mrs. Williams' home – its benefits from Blair's activities.

> "7) ITT retained these benefits with full knowledge of what Blair was doing and what he was not doing.

> "8) The evidence clearly supported a judgment on fraud, conspiracy[,] the OSCPA violations, and breach of contract.

> "9) The evidence also supported a jury's finding of the $15,000 in compensatory damages, reduced by the $3,326.04 which plaintiff asserted was used to pay off Mrs. Williams' pre-existing credit card obligations."

We note that ITT vigorously opposed some of the factual assertions made by Williams implicated in the above points, that the jury's answers to interrogatories do not definitively indicate the jury's conclusions on several of the points, and that some of the points listed therefore appear to be the trial judge's personal conclusions based on the evidence presented.

found liable to Williams on a civil conspiracy theory, and enough evidence was presented to the jury to sustain the verdict in favor of Williams on that ground; (3) the trial court did not err in submitting Williams's claims for violations of Ohio's CSPA and HSSA to the jury; and (4) the punitive damages awarded against ITT were not so excessive that the award violated due process. ITT has appealed the judgment of the court of appeals upholding the jury's damage awards to this court.

{¶ 26} The court of appeals reversed on the two issues Williams cross-appealed on, one dealing with the way the trial court entered judgment on the jury's verdict to start the running of postjudgment interest, and the other concerning the trial court's award of attorney fees. The court of appeals ordered that postjudgment interest should begin to run on an earlier date than had been ordered by the trial court, and also remanded to the trial court for a new determination of attorney fees. ITT has not appealed the rulings on Williams's cross-appeal to this court.

{¶ 27} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*William H. Blessing*, for appellee.

*Dinsmore & Shohl, Mark A. Vander Laan, M. Gabrielle Hils, Jeffrey R. Schaefer* and *Anthony J. Celebrezze, Jr.*, for appellant.

*Dreher, Langer & Tomkies, L.L.P., Darrell L. Dreher* and *Jeffrey D. Quayle,* urging reversal for *amici curiae*, Ohio Consumer Finance Association and Ohio Bankers Association.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 28} This appeal presents four principal issues for our review: (1) whether the trial court properly denied ITT's motion to compel arbitration; (2) the propriety of the grounds for Williams's recovery against ITT, under a theory of civil conspiracy, upheld by the court of appeals; (3) whether ITT was found

derivatively liable for punitive damages based on a third party's violations of the CSPA and HSSA; and (4) whether punitive damages were improperly assessed, and whether the amount of punitive damages awarded is so excessive that a due process violation occurred. For the following reasons, after a comprehensive review of the record, we affirm the judgment of the court of appeals on each issue.

I

Arbitration

{¶ 29} ITT argues in its fourth proposition of law that the broad arbitration provision in the loan agreement for the home equity loan Williams signed with ITT should have been enforced, and that this case should never have proceeded to trial. Furthermore, ITT takes issue with the court of appeals' determination that ITT was not "materially prejudiced" by the trial court's refusal to compel arbitration. The court of appeals found no prejudice, stating that ITT got the "real thing" (a trial) and also that "[a]rbitration is merely a substitute for litigation."

{¶ 30} ITT cites a long line of Ohio and federal cases, including cases decided by this court and by the United States Supreme Court, to support its arguments regarding a strong policy in favor of enforcement of arbitration clauses in written agreements. See, *e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967), 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; *Allied-Bruce Terminix Cos., Inc. v. Dobson* (1995), 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753.

{¶ 31} We agree with ITT that this court's precedents do indicate that arbitration is encouraged as a method to settle disputes. See, *e.g., ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 692 N.E.2d 574; *Council of Smaller Enterprises v. Gates, McDonald & Co.* (1998), 80 Ohio St.3d 661, 687 N.E.2d 1352; *Schaefer v. Allstate Ins. Co.* (1992), 63 Ohio St.3d 708, 711-712, 590 N.E.2d 1242, 1245. A presumption favoring arbitration arises when the claim in dispute falls within the scope of the arbitration provision. An arbitration clause in a contract is generally viewed as an expression that the parties agree to arbitrate disagreements

within the scope of the arbitration clause, and, with limited exceptions, an arbitration clause is to be upheld just as any other provision in a contract should be respected. See *Council of Smaller Enterprises*, 80 Ohio St.3d at 668, 687 N.E.2d at 1357.

{¶ 32} R.C. 2711.01(A) provides that a provision in a written contract such as is at issue in the present case "to settle by arbitration a controversy that subsequently arises out of the contract, or out of the refusal to perform the whole or any part of the contract * * * shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract."

{¶ 33} We have carefully examined the record, and we acknowledge, as the court of appeals did, that nowhere in the record did the trial court make a specific determination that the arbitration clause was unenforceable on equitable grounds, such as unconscionability. The trial court merely found the arbitration clause invalid, but gave no reason for the finding of invalidity. The record reveals that, given the procedural history of this case on the arbitration issue, the trial court may have been somewhat confused on what effect the resolution of the appeal on that issue by the court of appeals (left untouched by this court's decision to dismiss the further appeal) had on subsequent proceedings on remand.

{¶ 34} This court's precedents, as well as the directives of the United States Supreme Court, call into question some of the conclusions reached by the court of appeals regarding the enforceability of the arbitration provision at issue. Nevertheless, while not necessarily agreeing with all of the statements made by the court of appeals in support of its ultimate conclusion upholding the ruling of the trial court regarding arbitration, we do agree with that ultimate conclusion on this issue.

{¶ 35} The record in this case clearly would support a finding that the arbitration clause violated principles of equity, given all of the attendant facts and circumstances. Williams filed an affidavit in the trial court regarding the arbitration

clause's inclusion in the loan agreement, to support her challenge to the specific validity of the arbitration clause. After taking into account both the procedural and substantive progress of this case, we find that the complete record compels the conclusion that the trial court, while not specifically declaring the arbitration agreement to be invalid (*i.e.,* because the arbitration clause itself was unconscionable), did in essence make that determination.

{¶ 36} The trial court was entitled initially to view the arbitration clause at issue with some skepticism. In the situation presented here, the arbitration clause, contained in a consumer credit agreement with some aspects of an adhesion contract, necessarily engenders more reservations than an arbitration clause in a different setting, such as in a collective bargaining agreement, a commercial contract between two businesses, or a brokerage agreement. See, generally, 1 Domke on Commercial Arbitration (Rev.Ed.1997) 17-18, Section 5.09. When the further complete situation of this case is taken into account, *i.e.*, Williams's evidence regarding the conspiracy between ITT and Blair as the fundamental reason for her entering into the loan agreement in the first place, and also the questionable conditions under which the dispute would be submitted to arbitration as revealed in the record, there is further support for the invalidity of the arbitration clause.

{¶ 37} A virtually identical arbitration clause was challenged as unenforceable in *Patterson v. ITT Consumer Fin. Corp.* (Cal.App.1993), 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563. In *Patterson* the court considered whether the loan agreement was an adhesion contract on facts virtually the same in all relevant respects to the loan agreement at issue in the case *sub judice*, and determined that it was "indisputable that the contract was one of adhesion." 14 Cal.App.4th at 1664, 18 Cal.Rptr.2d at 566.

{¶ 38} The court examined the one-sided rules establishing the prerequisites to achieving an arbitration hearing, and also considered that a consumer was required by the rules to prepay a substantial amount of fees as a

condition precedent to arbitration. The court concluded, "The likely effect of these procedures is to deny a borrower against whom a claim has been brought any opportunity to a hearing, much less a hearing held where the contract was signed, unless the borrower has considerable legal expertise or the money to hire a lawyer and/or prepay substantial hearing fees. * * * In a dispute over a loan of $2,000 it would scarcely make sense to spend a minimum of $850 just to obtain a participatory hearing." *Id*. at 1666, 18 Cal.Rptr.2d at 566.

**{¶ 39}** The *Patterson* court held that this arbitration provision was unconscionable, and thus unenforceable: "The contractual risk of a dispute resolution process which is weighted heavily against the borrower being able to obtain a hearing seems particularly unreasonable in light of the much greater bargaining power of ITT and its reluctance to disclose even the mechanics of [the] arbitration until it makes an arbitration claim." *Id*. at 1666, 18 Cal.Rptr.2d at 567.

**{¶ 40}** The parallels between the *Patterson* case and the case before us are striking. *Patterson* involved small consumer loans made by ITT on preprinted forms similar to the form signed by Williams, with a virtually identically worded arbitration clause. Consequently, based on the specific circumstances present here, we determine that the trial court's decision denying ITT's motion to compel arbitration was tantamount to a finding that the agreement to arbitrate was invalid, and further that the arbitration provision was unconscionable. We determine that any presumption in favor of arbitration was overcome based on the entire record of this case. Furthermore, we believe that the presumption in favor of arbitration should be substantially weaker in a case such as this, when there are strong indications that the contract at issue is an adhesion contract, and the arbitration clause itself appears to be adhesive in nature. In this situation, there arises considerable doubt that any true agreement ever existed to submit disputes to arbitration.

{¶ 41} We recognize that the failure of the trial court to make a specific determination of unconscionability on the record made ITT's appeal more difficult to frame. However, we determine that this case properly proceeded to trial, and we find no merit in ITT's fourth proposition of law.

II

Civil Conspiracy

{¶ 42} At the court of appeals, ITT challenged the theories of recovery relied upon by Williams at trial. The court of appeals sustained ITT's arguments in part, finding that Blair was not acting as an agent of ITT, as a matter of law, when he induced Williams to contract with him to do the improvements on her home. We agree with the court of appeals that no agency relationship between Blair and ITT was shown. However, while finding that the jury's verdict could not be sustained on agency grounds, the court of appeals further upheld the jury verdict against ITT based on Williams's additional claim that ITT participated in a civil conspiracy against her. The jury, in its answer to interrogatory number one, specifically found that ITT participated in a conspiracy that damaged Williams.

{¶ 43} In upholding the jury's verdict against ITT, the court of appeals determined that ITT violated a duty to disclose (arising in the "special circumstances" of this case) to Williams based on ITT's knowledge of the fraudulent activities of Blair, as asserted by Williams at trial. The court of appeals held that this fraudulent concealment of material information by ITT was ITT's contribution to the civil conspiracy perpetrated by Blair and ITT on Williams, and that this concealment justified the jury's verdict against ITT.

{¶ 44} In its first proposition of law, ITT takes issue with the court of appeals' determination that a duty to disclose owed to Williams, based on special circumstances, was violated by ITT. ITT urges that the relationship of a borrower to a lending institution is not a fiduciary relationship, that there is no duty to speak, and that the "special circumstances" exception to this rule adopted by the court of

appeals is "so vague and standardless as to be unworkable." See, *e.g.*, *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363, paragraph two of the syllabus ("A creditor and consumer stand at arm's length in negotiating the terms and conditions of a consumer loan and, absent an understanding by both parties that a special trust and confidence has been reposed in the creditor, the creditor has no duty to disclose to the consumer the existence and details" regarding aspects of the transaction.); *Ed Schory & Sons, Inc. v. Francis* (1996), 75 Ohio St.3d 433, 442, 662 N.E.2d 1074, 1081 (a fiduciary relationship between a debtor and a creditor may be created out of an informal relationship only when both parties understand the existence of a special trust or confidence).

{¶ 45} We do not view this case the same way the court of appeals did. Although we affirm the judgment of the court of appeals that, on the facts of this case, the jury verdict against ITT can be upheld for ITT's role in a civil conspiracy with Blair against Williams, we disagree with the reliance by the court of appeals on the "special circumstances" exception to the general rule of no duty to disclose.

{¶ 46} Consequently, we disagree with the analysis of the court of appeals. Because our analysis differs from that of the court of appeals, we do not approach the resolution of ITT's first proposition of law in the manner the issue is presented by ITT, but instead explain why ITT's contentions regarding a duty to disclose are not relevant to our consideration.

{¶ 47} The tort of civil conspiracy is " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866, quoting *LeFort v. Century 21-Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645; *Gosden v. Louis* (1996), 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496; *Minarik v. Nagy* (1963), 8 Ohio App.2d 194, 196, 93 Ohio Law Abs. 166, 168, 26 O.O.2d 359, 360, 193 N.E.2d 280, 281. See 16 American Jurisprudence 2d (1998),

Conspiracy, Sections 50-73. For a thorough analysis of the elements of civil conspiracy and an explanation of how the tort subtly differs from the related aiding and abetting theory of liability, see, generally, *Halberstam v. Welch* (C.A.D.C.1983), 705 F.2d 472.

{¶ 48} An underlying unlawful act is required before a civil conspiracy claim can succeed. *Gosden*, 116 Ohio App.3d at 219, 687 N.E.2d at 496; *Minarik*, 8 Ohio App.2d at 195, 93 Ohio Law Abs. at 168, 26 O.O.2d at 360, 193 N.E.2d at 281. The malice involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 11 O.O.2d 199, 200, 166 N.E.2d 227, 229; *Gosden*, 116 Ohio App.3d at 219, 687 N.E.2d at 496.

{¶ 49} Fraud is

" '(a) a representation or, where there is a duty to disclose, concealment of a fact,

" '(b) which is material to the transaction at hand,

" '(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

" '(d) with the intent of misleading another into relying upon it,

" '(e) justifiable reliance upon the representation or concealment, and

" '(f) a resulting injury proximately caused by the reliance.' " *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 10 OBR 500, 502, 462 N.E.2d 407, 409, quoting *Friedland v. Lipman* (1980), 68 Ohio App.2d 255, 22 O.O.3d 422, 429 N.E.2d 456, paragraph one of the syllabus. See, also, *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus; *Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083.

**{¶ 50}** The court of appeals found that there was no testimony in the record that would justify a finding that any ITT representative misrepresented a fact material to the loan agreement to Williams, and so proceeded to consider whether ITT representatives had concealed a material fact from Williams under element (a) of *Cohen* set out above. The court of appeals based its reasoning upon the consideration that, although Blair referred Williams to ITT, ITT did an independent evaluation of her creditworthiness before issuing her the loan.

**{¶ 51}** We disagree with this specific part of the court of appeals' analysis. If ITT and Blair did engage in a conspiracy to defraud Williams, as Williams alleged, then, as a consequence of the existence of the conspiracy, the finding could be upheld that ITT representatives engaged in fraud against Williams. In a conspiracy, the acts of coconspirators are attributable to each other. See Prosser & Keeton on Torts (5 Ed.1984) 323, Section 46 ("All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable." [Footnotes omitted.]).

**{¶ 52}** After a comprehensive review of the record, we determine that the jury reasonably determined on the sum total of the evidence presented that employees of ITT conspired with Blair to defraud Williams, with resulting damages to her. ITT can be held liable for the intentional torts of its employee loan officers committed within the scope of their employment. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 329, 587 N.E.2d 825, 828-829; *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 58, 565 N.E.2d 584, 587. ITT's role in the conspiracy was to allow Blair to have access to loan money that was necessary to further his fraudulent actions against customers such as Williams. Thus, ITT employees themselves affirmatively committed fraud by the very acts of making the loans to Williams and others.

**{¶ 53}** In particular, the testimony of former ITT branch manager and regional manager Jeffrey Stires supported Williams's claims that ITT employees conspired with Blair. Stires testified that Blair's financial problems were well known among ITT employees for a significant time before the loan was made to Williams, and that the term "Blair loan" had developed a specific, highly negative connotation among employees of ITT. In addition, Stires and others testified to the close relationship between Blair and ITT's employees.

**{¶ 54}** Because we find that the record provides ample support for the jury's verdict, we disagree with the court of appeals' discussion regarding ITT's violation of a duty to disclose relevant information to Williams. The imposition of liability on ITT on a civil conspiracy theory of recovery is sustainable without a need to rely on the analysis set forth by the court of appeals. We therefore do not address the specific arguments made by ITT and *amici curiae* on the ramifications of the court of appeals' holding on the disclosure issue, and sustain the jury's verdict that ITT and Blair conspired to commit a fraud that damaged Williams.

III

Punitive Damages

**{¶ 55}** ITT challenges the award of punitive damages against it on several fronts. ITT claims that it should not be derivatively liable for punitive damages based on Blair's violations of the CSPA and HSAA. ITT also argues that punitive damages should never have been awarded based on any of the other theories presented at trial, or based on a violation of the duty to disclose which the court of appeals relied on in upholding compensatory damages based on civil conspiracy. Furthermore, ITT argues that the amount of punitive damages awarded was grossly excessive.

A.     CSPA/HSSA liability as support for punitive damages

**{¶ 56}** In the trial court and in the court of appeals, ITT argued that, because it is a dealer in intangibles, its loan contract with Williams was not a "consumer

transaction" per R.C. 1345.01, so that the CSPA, R.C. 1345.01 *et seq*., did not apply to it.  See, also, R.C. 5725.01.  ITT also argued that the HSSA, R.C. 1345.21 *et seq.,* did not apply.  Williams opposed ITT's claims in this regard by arguing that ITT did more than merely make an arm's-length loan to Williams.  Williams contended that ITT was sufficiently intertwined with Blair in dealing with Williams that ITT, by virtue of its relationship with Blair, could be found liable under the CSPA and HSSA.

{¶ 57} The court of appeals found no need to address ITT's arguments on the grounds raised by ITT, determining that due to the Federal Trade Commission's "holder rule" set forth in Section 433.2(a), Title 16, C.F.R., Williams could sue ITT derivatively for Blair's violations of the CSPA and HSSA.  In this situation, ITT is being held accountable not as a financial institution, but instead as a holder of a consumer credit contract.  See *Milchen v. Bob Morris Pontiac-GMC Truck* (1996), 113 Ohio App.3d 190, 195, 680 N.E.2d 698, 701-702 (because the consumer is blameless when the seller fails to deliver the promised performance of goods or services purchased on credit, the Federal Trade Commission believed it was equitable to reallocate the cost of seller misconduct from the debtor to the creditor); *Ambre v. Joe Madden Ford* (N.D.Ill.1995), 881 F.Supp. 1182, 1184-1185.

{¶ 58} The document signed by Williams to acquire the loan from ITT included the following language, pursuant to Section 433.2(a), Title 16, C.F.R.:

"NOTICE

"ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.  RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

**{¶ 59}** As we understand ITT's third proposition of law, ITT no longer argues that it was improperly subjected to liability under the CSPA and HSSA. ITT now argues that it could not be found derivatively liable for *punitive damages* based on the CSPA and HSSA, but at most could be found liable only for Williams's actual damages caused by Blair, with those damages limited to an absolute maximum of the "amounts paid by the debtor" thereunder – the $11,500 Williams paid to Blair for the work never completed. ITT contends that the court of appeals was mistaken in utilizing the "FTC holder rule" to sustain the punitive damages award. In support, ITT cites *Hardeman v. Wheels, Inc.* (1988), 56 Ohio App.3d 142, 565 N.E.2d 849, in which the court found that, because liability imposed derivatively against a lender under the FTC holder rule is not based on the lender's own misconduct, and because punitive damages are assessed to punish conscious wrongdoing, an award of treble damages under R.C. 1345.09 against a culpable party may not be imposed derivatively under Section 433.2, Title 16, C.F.R.

**{¶ 60}** We disagree with ITT's interpretation that the court of appeals sustained the punitive damages award based on ITT's derivative liability under the CSPA and HSSA. Rather, our reading of the court of appeals' opinion convinces us that the court of appeals sustained the punitive damages award based on a civil conspiracy between Blair and ITT to defraud Williams. We concur in the determination of the court of appeals that the award is sustainable on that basis, and therefore, we find no merit in ITT's third proposition of law.

B.      Other support for punitive damages award

**{¶ 61}** As one part of its second proposition of law, ITT argues that it is unfair to subject it to liability for punitive damages when the court of appeals upheld the punitive damages based upon ITT's violation of a duty to disclose that was only first recognized in the court of appeals' opinion. The further argument made by ITT is that ITT should not have been found liable for punitive damages on a theory of liability never submitted to the jury. As we have explained above, we

20

disagree with the court of appeals' conclusion that ITT's violation of a duty to disclose was the basis for upholding liability against ITT for civil conspiracy. Therefore, we determine that ITT was not found liable for punitive damages based on the violation of an unanticipated duty to disclose, and that ITT was found liable based on a theory submitted to the jury. We do not further address ITT's argument in this regard.

{¶ 62} ITT also challenges the award of punitive damages by reiterating one of its earlier arguments opposing the imposition of liability for compensatory damages in this case, which is that the case went to the jury primarily on Williams's claim that Blair was an agent of ITT, so that the jury awarded punitive damages against ITT primarily for actions attributable solely to Blair. As explained above, we agree with the court of appeals' ultimate conclusion that, even though Blair was not ITT's agent, the jury's finding that ITT was liable for compensatory damages should be upheld due to ITT's role in a civil conspiracy against Blair. For the same reasons that compensatory damages are supportable against ITT, punitive damages are also supported.

C.     Excessiveness of punitive damages award

{¶ 63} As another component of its second proposition of law, ITT, citing *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, contends that the punitive damage award of $1.5 million is grossly excessive. In *BMW*, the United States Supreme Court found that a $2 million punitive damages award was sufficiently excessive under the facts of that case that the award violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

{¶ 64} In *BMW*, the court followed three guideposts, or indicia, of excessiveness to evaluate whether the punitive damages award violated due process. The three indicia are (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm to the plaintiff and

the amount of the punitive damages, and (3) the difference between the amount of punitive damages awarded and the civil or criminal sanctions available to be imposed for similar misconduct. See 517 U.S. at 574-575, 116 S.Ct. at 1598-1599, 134 L.Ed.2d at 826.

{¶ 65} We observe that the court in *BMW* appeared to tailor its decision very much to the specific facts of that case, with the three guideposts followed because they lent themselves well to the facts at hand. The court appeared to reject a categorical approach, with the result that the list of guideposts probably is not exhaustive, so that other factors likely will be relevant in the appropriate case. Furthermore, it would appear that when one of the guideposts is particularly relevant, a lesser reliance on the other guideposts may be justified. We question whether most defendants who challenge punitive damages based on the indicia discussed in *BMW* will be successful, given the statement in the concurring opinion in *BMW* to the effect that that justice viewed *BMW* as an "unusual case" in which the facts justified a conclusion that the punitive damages violated due process sufficient to overcome the "strong presumption of validity" attaching when a punitive damages award is not suspect on other grounds. *BMW*, 517 U.S. at 597, 116 S.Ct. at 1609, 134 L.Ed.2d at 840 (Breyer, J., joined by O'Connor and Souter, JJ., concurring).

{¶ 66} The court of appeals below analyzed the punitive damages award under the *BMW* guideposts, found that the amount awarded was not so excessive as to violate due process, and deferred to the judgment of the jury.

{¶ 67} We generally agree with the court of appeals' consideration of the *BMW* factors here, and we likewise determine that the punitive damages awarded did not violate due process. We observe that there is ample evidence in the record that ITT engaged in wrongful conduct sufficient to merit an award of punitive damages. Furthermore, as the jury's responses to the interrogatories (along with the size of the punitive damages award) conclusively indicate, the jury accepted

Williams's position on the key questions of fact, and rejected ITT's position. Thus, we must agree with the court of appeals that the jury's verdict is entitled to deference. Because the jury found ITT's conduct to be sufficiently reprehensible, consideration of the first guidepost of *BMW* yields the conclusion that due process was not violated in this case. Likewise, consideration of the other two guideposts also results in the conclusion that due process was not violated.

**{¶ 68}** "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343; see, also, *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The amount of punitive damages awarded may be excessive when it is determined to have been the product of passion and prejudice. See *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 39, 543 N.E.2d 464, 468. If the punitive damages award is not the result of passion and prejudice, and not the result of legal error, it is generally not within the province of a reviewing court to substitute its view for that of the jury. See *id*. at 40, 543 N.E.2d at 469. See, also, *id*. at 43-44, 543 N.E.2d at 471-472 (H. Brown, J., concurring). Since the punitive damages awarded in this case were not the result of passion and prejudice, and not the result of legal error, we uphold the jury's punitive damage award.

IV

Conclusion

**{¶ 69}** In conclusion, we find that this case properly proceeded to trial, that ITT was properly found liable for its part in an alleged civil conspiracy against Williams, and that the amount of punitive damages awarded is not so excessive as to violate due process based on all the facts and circumstances in the record. The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., and COOK, J., concur in part and dissent in part.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶ 70} I agree with the majority that Williams minimally supported her civil conspiracy claim at trial and that the jury's finding of liability against ITT on that issue should stand. Based on the state of the record in this case, however, I cannot agree with the majority on the arbitration issue or with its analysis of the punitive damages issue.

Arbitration

{¶ 71} I respectfully disagree with the majority's conclusion regarding the conscionability of the arbitration clause. Until today's decision, no court has found the arbitration clause between ITT and Williams to be unconscionable. As acknowledged by both the majority and the appellate court in this case, the trial court *never* resolved the issue of whether the arbitration clause was valid, much less whether the arbitration clause was unconscionable. The reason for the lack of such a finding is that the parties never litigated this issue due to the odd procedural history of this case. The plaintiff never sought to prove the arbitration clause unconscionable; she thought she had prevailed on that issue.

{¶ 72} Much of the majority's unconscionability analysis focuses on analogies between this case and *Patterson v. ITT Consumer Fin. Corp.* (Cal.App.1993), 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563—a case where a California appellate court found a similar agreement to arbitrate disputes between a plaintiff and ITT before the National Arbitration Forum ("NAF") unconscionable. There are several reasons, however, to distinguish *Patterson* and enforce the arbitration provision in this case.

{¶ 73} As evidenced by R.C. Chapter 2711, there exists a strong legislative policy in Ohio favoring arbitration. The same policy preference is stated in federal

24

arbitration laws, which were specifically incorporated into the contract between Williams and ITT by reference. Section 2, Title 9, U.S.Code. Furthermore, the General Assembly has done nothing to limit that policy preference to commercial transactions. See R.C. Chapters 1321, 1322, 1345 and 1349.

{¶ 74} Though state and federal legislation favors enforcement of agreements to arbitrate, both R.C. 2711.01(A) and Section 2, Title 9, U.S.Code permit a court to invalidate an arbitration agreement on equitable or legal grounds that would cause any agreement to be revocable. One such ground is unconscionability. " 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' *Williams v. Walker-Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449." *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 383, 613 N.E.2d 183, 189. Accordingly, unconscionability has two prongs: a procedural prong, dealing with the parties' relation and the making of the contract, and a substantive prong, dealing with the terms of the contract itself. Both prongs must be met to invalidate an arbitration provision.

{¶ 75} In explaining the analogies between this case and *Patterson*, the majority appears to stress the disparity of bargaining power between the parties and arbitration costs as reasons for nullifying the agreement to arbitrate as unconscionable. These factors, however, if by themselves deemed to render arbitration provisions of a contract unconscionable, could potentially invalidate a large percentage of arbitration agreements in consumer transactions.

{¶ 76} The disparity of bargaining power between Williams and ITT would be one factor tending to prove that the contract was procedurally unconscionable. A finding of procedural unconscionability, or that the contract is one of adhesion, however, requires more. "Black's Law Dictionary (5 Ed.1979) 38, defines a contract of adhesion as a '[s]tandardized contract form offered to consumers of

goods and services on essentially "take it or leave it" basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. * * *' " *Sekeres v. Arbaugh* (1987), 31 Ohio St.3d 24, 31, 31 OBR 75, 81, 508 N.E.2d 941, 946-947 (H. Brown, J., dissenting), citing *Wheeler v. St. Joseph Hosp.* (1976), 63 Cal.App.3d 345, 356, 133 Cal.Rptr. 775, 783*; Std. Oil Co. of California v. Perkins* (C.A.9, 1965), 347 F.2d 379, 383. See, also, *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 37, 514 N.E.2d 702, 707, fn. 7.

**{¶ 77}** In the present case, Williams did not demonstrate that she would have been unable to obtain a loan from other sources. In fact, part of her civil conspiracy argument is that ITT targeted her for a loan because of the substantial amount of equity that she had built up in her house.

**{¶ 78}** There is no evidence in the record that the arbitration clause was concealed or misrepresented to Williams. In fact, the record reveals that Williams did read the contract and understood after she read the contract that she had three days to cancel.

**{¶ 79}** Additionally, there are differences between this case and *Patterson* relating to substantive unconscionability. The *Patterson* court remarked that "arbitration per se may be within the reasonable expectations of most consumers," but noted that some of the terms of the particular contract, when combined with the NAF's procedural rules, were oppressive to the consumer. *Patterson v. ITT Consumer Fin. Corp.,* 14 Cal.App.4th at 1665, 18 Cal.Rptr.2d at 566. The court concluded that the arbitration clause at issue was worded so that it could mislead a reasonable reader to believe that he or she had in fact agreed to arbitration in Minnesota. That is not true in our case, where the arbitration clause states in bold print:

"You and ITT Financial Services agree that, other than judicial foreclosures and cancellations regarding real estate security, any dispute, past, present, or future,

between us or claim by either against the other or any agent or affiliate of the other, whether related to your loan, products you purchase through ITT Financial Services, or otherwise, shall be resolved by binding arbitration in accordance with the arbitration rules of the National Arbitration Forum, Minneapolis, Minnesota, and judgment upon any award by the arbitrator may be entered in any court having jurisdiction over claims of the amount of the award. We agree that the transactions between us are in interstate commerce and this agreement shall be subject to 9 USC §1-14, as amended."

{¶ 80} In turn, Rule 14 of the NAF Code of Procedure mandates that "[a]ll Participatory Hearing Sessions shall be held in the Federal Judicial District where the Arbitration Agreement was executed." Accordingly, there is nothing in the contract language under consideration to lead a reasonable consumer to believe that he or she would have to arbitrate the dispute in Minnesota.

{¶ 81} The *Patterson* court also appears to have considered it important that the case was one that involved a small claim, but, because of the arbitration clause, the consumers therein would be forced to spend a minimum of $850 on a dispute over a $2,000 loan. Additionally, part of the *Patterson* court's concern that the likely effect of the NAF procedures would be "to deny a borrower against whom a claim has been brought any opportunity to a hearing, much less a hearing held where the contract was signed, *unless the borrower had considerable legal expertise or the money to hire a lawyer and/or prepay substantial hearing fees"* may relate to the fact that absent the arbitration agreement, a proper venue for the claims involved would have been small claims court. (Emphasis added.) *Id.* 18 Cal.Rptr.2d at 566. Those concerns are not present in this case, where the plaintiff initiated the action seeking substantial compensatory and punitive damages and was at all times represented by an attorney.

{¶ 82} Finally, the majority's reference to "evidence regarding the conspiracy between ITT and Blair as a fundamental reason for her entering into the

loan agreement in the first place" does not support its conclusion that the case was properly withheld from arbitration. As is apparent from the majority opinion, the unlawful act underlying the civil conspiracy claim was fraud. Moreover, according to the majority, that fraud relates to either Blair's fraudulent inducement of Williams to contract with him for the home repairs or ITT's "acts of making the loans to Williams and others." There is neither evidence nor a finding by any court that ITT fraudulently induced Williams into agreeing to arbitrate her disputes, an issue separate from the fraud issue. Accordingly, those factual issues were proper subjects for arbitration, and did not provide the trial court a reason to withhold the case from arbitration. *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 692 N.E.2d 574, syllabus; *Williams v. Aetna Fin. Co.* (1992), 65 Ohio St.3d 1203, 602 N.E.2d 246 (Wright, J., dissenting). Labeling acts of fraud as "unconscionable" should not support the circumventing of this court's unanimous decision in *ABM Farms*.

{¶ 83} It would be unfortunate if the breadth of today's decision works toward the wholesale invalidation of arbitration clauses in consumer transactions — a policy decision that, if made at all, should be made by the General Assembly.

Punitive Damages

{¶ 84} I disagree with the way that the majority analyzes the punitive damages issue, but nevertheless agree with its ultimate conclusion. As recognized by the majority, *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, sets out three guideposts for evaluating whether a punitive damages award is grossly excessive and therefore violative of due process. Those guideposts are (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm suffered by the plaintiffs and their punitive damages award, and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 574-575, 116 S.Ct. at 1598-1599, 134 L.Ed.2d at 826.

{¶ 85} In addressing the first guidepost—the degree of reprehensibility of the defendant's conduct—the majority cites the jury's interrogatories and *the size of the punitive damages award itself* as demonstrating that ITT's conduct was sufficiently reprehensible to justify the large punitive damages award. That reasoning could be said to be circular and begs the true question related to the first *BMW* guidepost — which is whether, from a legally objective standpoint, the defendant's conduct was so reprehensible that it tends to justify the jury's award.

{¶ 86} While Justice Breyer's concurrence in *BMW* states that a "strong presumption of validity" should attach to a punitive damages award, his concurrence does not support this majority's analysis. *Id*. at 586-587, 116 S.Ct. at 1604, 134 L.Ed.2d at 833. Justice Breyer's concurrence specifically noted that a jury's punitive damages award should be checked against legal standards "that provide 'reasonable constraints' within which 'discretion is exercised,' that assure 'meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages,' and permit 'appellate review [that] makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition' *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 20-21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 21-22. See also *id.,* at 18, 111 S.Ct. at 1043, 113 L.Ed.2d at 20 ('[U]nlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities')." *Id.* at 587, 116 S.Ct. at 1605, 134 L.Ed.2d at 833-834. Accordingly, it is the court's duty to independently evaluate the jury's award in relation to the *BMW* guideposts. Deference to the jury's award does not replace the court's independent function in reviewing whether a punitive damages award is violative of due process.

{¶ 87} Without explanation, the majority also states that "consideration of the other two [*BMW*] guideposts also results in a conclusion that due process was

not violated." Thus, the majority does not explain its conclusion that a punitive damages award one hundred times the amount of actual damages bears a reasonable relationship to harm that resulted or that was likely to result from ITT's actions. The *BMW* court found a five-hundred-to-one ratio grossly excessive and further suggested that even a thirty-five-to-one ratio would weigh in favor of finding the punitive damages award grossly excessive. *Id.* at 582, 116 S.Ct. at 1602, 134 L.Ed.2d at 830, fn. 35. The *Haslip* court concluded that a punitive damages award four times the amount of compensatory damages "might be close to the line," but did not "cross the line into the area of constitutional impropriety." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. at 23-24, 111 S.Ct. at 1045, 113 L.Ed.2d at 23. And, calculating the potential harm to the victim if the tortious activity had succeeded, the court relied upon a ten-to-one ratio of punitive damages to potential harm in determining that punitive damages were not grossly excessive in *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. 443, 462, 113 S.Ct. 2711, 2722, 125 L.Ed.2d 366, 382. Considering the federal precedent, the second *BMW* factor would also appear to require deeper due process analysis than is apparent from the majority opinion.

{¶ 88} Ultimately, I agree with the majority's conclusion that punitive damages are not so grossly excessive in this case that they violate due process. Relying on circumstances supporting the jury's finding of a civil conspiracy and Ohio's civil and criminal penalties for fraud, I find that this high ratio of actual damages to punitive damages passes constitutional muster. My differences with the majority in interpreting what *BMW* requires are purely theoretical. Nevertheless, I think it important to properly interpret the *BMW* guideposts as set forth by the United States Supreme Court, because our interpretation may make a difference in future cases.

MOYER, C.J., concurs in the foregoing opinion.

———————————

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 89} I respectfully dissent from the majority's decision on arbitration and join in Justice Cook's dissenting opinion on the arbitration issue only. However, on all remaining issues, I join the majority.

———————————