OPINION
{¶ 1} This appeal arises from a trial court decision granting a stay pending arbitration. On April 19, 2004, Appellant, David Swayze, filed a complaint against Huntington Investment Company, Huntington National Bank, and Mike Young (a broker), alleging negligence, fraud, and breach of contract in connection with the sale and purchase of Qual Comm stock. In the complaint, Swayze alleged that he opened an investment account with Defendants on April 1, 1998, and later sustained losses of $122,221, because Defendants mishandled the account.
 {¶ 2} Shortly after the action was filed, Huntington Investment and Young moved for a stay of all proceedings pending arbitration. Attached to their motion was a "new account application" that Swayze had signed. Paragraph 10 of the application stated in large, bold type and all capitals, that:
 {¶ 3} "I Represent that I have read the terms and conditions governingthis account and agree to be bound by such terms and conditions ascurrently in effect and as may be amended from time to time. This accountis governed by a pre-dispute arbitration agreement which is found on theback of this application paragraph 15. I acknowledge receipt of thepre-dispute arbitration agreement."
 {¶ 4} Paragraph 15 of the account's terms and conditions bore the following heading, in bold and capitalized type: "BROKERAGE ACCOUNTPRE-DISPUTE ARBITRATION AGREEMENT." Under this heading, paragraph 15 stated that arbitration would be final and binding on the parties, and that the parties waived their right to seek remedies in court, including the right to a jury trial. The parties also agreed to submit "any and all controversies or claims arising out of the relationship established by this agreement or any corresponding agreement to arbitration to be conducted according to the rules and procedures of the New York Stock Exchange, Inc. (NYSE) or the National Association of Securities Dealers, Inc. (NASD)."
 {¶ 5} Swayze responded to the motion to stay by filing an affidavit and his own copy of the "new account application." Although Swayze admitted that he had signed the new account application, he claimed that the back of the application was blank. In addition, Swayze said he had never seen the paragraphs relating to arbitration. He also said he was never told that account disputes had to be arbitrated.
 {¶ 6} Huntington responded with an affidavit from the employee who had signed and approved Swayze's new account application. The employee stated that when Swayze signed the new account application, it was printed and distributed in a folder that contained three identical copies of the front side of the new account application. Two copies, including the one designated for the customer, had printing on the reverse side, setting out the terms of the account agreement. Therefore, only one copy would have been blank on the back side. All three copies contained the statement indicating that the account was governed by the predispute arbitration agreement.
 {¶ 7} After considering the evidence, the trial court found that the arbitration provisions were not unconscionable and that the arbitration clause was not obtained by fraud. Consequently, the court ordered the case stayed pending arbitration. Swayze now appeals, raising the following assignments of error (quoted verbatim and without correct punctuation having been inserted):
 {¶ 8} "In the Court's Decision et al [sic] on first page under heading of facts the Court refers to this being a case subject to pre-dispute via Arbitration Agreement. The New.
 {¶ 9} Account was prepared by the Defendants and the terms of any type Arbitration Agreement were never made known to the Plaintiff in any fashion until after this suit was filed.
 {¶ 10} "In the Court's Decision et al [sic] on second and third pages on heading of Law and Analysis the Court did not consider a cornerstone of Contract law involving ambigouis [sic] terms being construed most strongly against the party that prepared the contract.
 {¶ 11} "The Court in its Analysis of the Laws to be applied in this [sic] did not consider the element of fraud that occurred in trying to hold Plaintiff to arbitration without ever advising Plaintiff of the terms of the arbitration."
 {¶ 12} After considering the assignments of error, we find them without merit. Accordingly, the three assignments of error will be overruled.
 I {¶ 13} As a preliminary point, we note that Swayze has not separately addressed each assignment of error, but has combined his discussion. Consequently, we will do the same. Essentially, Swayze contends that the contract is "one-sided" and ambiguous. Swayze also complains of fraud in the inducement because the Defendants allegedly obtained his signature on the contract without telling him of the pertinent terms.
 {¶ 14} Before we discuss the merits of Swayze's argument, we must consider choice of law, as the contract states that Massachusetts law will govern the agreement and its enforcement. Where parties choose the governing law for a contract, that law will be applied unless:
 {¶ 15} "(a) the chosen state has no relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties." Schulke Radio Productions, Ltd.v. Midwestern Broadcasting Co. (1983), 6 Ohio St.3d 436, 438-439,453 N.E.2d 683.
 {¶ 16} Massachusetts appears to have no relationship to the parties, or at least none that is apparent in the record. The contract was signed and performed in Ohio, and the Defendants maintained offices in Ohio. There also appears to be no reasonable basis for choosing Massachusetts law — or at least none that is evident. While one might assume that Huntington Investment operates nationwide, and that the agreement is used in many states, those facts are not of record. As a result, we would not necessarily choose to apply Massachusetts law.
 {¶ 17} Nonetheless, the choice of law issue is essentially irrelevant, because there are no significant differences between Ohio and Massachusetts on the subject of arbitration. Compare Lyon FinancialServices, Inc. v. C S Lounge Carry Out (Apr. 22, 1997), Franklin App. No. 96APE08-1127, 1997 WL 202228, *2 (applying law chosen by agreement where law of foreign state did not conflict with Ohio law).
 {¶ 18} Both Ohio and Massachusetts have adopted the Uniform Arbitration Act. Compare R.C. Chap. 2711 with Mass. Gen. Laws Ann. 251, §§ 1-19. In addition, Massachusetts, like Ohio, favors arbitration and relies on federal arbitration law in interpreting its own arbitration statutes. Compare Quirk v. Data Terminal Systems, Inc. (1980),379 Mass. 762, 767-68, 400 N.E.2d 858, with ABM Farms, Inc. v. Woods,81 Ohio St.3d 498, 501, 1998-Ohio-612, 692 N.E.2d 574. In Quirk, the Massachusetts Supreme Judicial Court held that arbitration should be ordered unless the claim is that the arbitration clause itself (rather than the contract as a whole), has been induced by fraud.379 Mass. at 766-68. Similarly, in ABM Farms, the Ohio Supreme Court held that "to defeat a motion for stay brought pursuant to R.C. 2711.02, a party must demonstrate that the arbitration provision itself in the contract at issue, and not merely the contract in general, was fraudulently induced."
 {¶ 19} In ABM Farms, the court also noted that to establish fraudulent inducement.
 {¶ 20} "a plaintiff must prove that the defendant made a knowing, material misrepresentation, with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." 81 Ohio St.3d at 502 (citation omitted).
 {¶ 21} Factually, ABM Farms is quite similar to the present case. As here, the plaintiff in ABM Farms signed forms creating a brokerage account. The forms indicated that the plaintiff had read and understood the terms of the account agreement and agreed to arbitrate disputes that might arise in accordance with the pre-dispute arbitration clause. Id. at 499. However, the plaintiff did not read the forms and the existence of an arbitration agreement was never discussed. Id. at 500. In fact, the subject of arbitration was never mentioned. Id. at 502. The plaintiff also never received a copy of the account agreement booklet that described the terms of the arbitration agreement. Id.
 {¶ 22} Based on these facts, the Ohio Supreme Court found no evidence of fraudulent inducement. Of significance is the court's comment that at the center of the plaintiff's.
 {¶ 23} "allegation of fraudulent inducement is the naked truth that she did not read the contract. It drives a stake into the heart of her claim. `A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.'" Id. at 503.
 {¶ 24} Like the investor in ABM Farms, Swayze was not misled because he could have read the contract. Swayze contends that he was never told about arbitration and that he was not given a copy of the agreement. The evidence from Huntington's employee indicates that Swayze did receive a copy of the arbitration agreement. However, this dispute is not material. The fact is that Swayze signed a form indicating that he had read the terms and conditions of the agreement. He also agreed to be bound by the conditions, which included pre-dispute arbitration. An individual who fails to read what he signs cannot argue that he has been misled; willing ignorance is the very antithesis of being fooled by another.
 {¶ 25} We also reject the claim that the agreement was ambiguous. In his brief, Swayze fails to point out any specific ambiguity, and we decline to speculate. We also do not find the agreement "one-sided." In this regard, Swayze relies on Stout v. J.D. Byrider (C.A.6, 2000),228 F.3d 709, 716, in which the Sixth Circuit Court of Appeals commented that:
 {¶ 26} "[u]nder Ohio law, in order for an arbitration provision to be unconscionable, it must be one-sided, deny the less advantaged party meaningful choice in accepting the terms of the contract, and involve a situation such that the less advantaged party cannot obtain their desired product or services except by acquiescing to the form contract." Id. at 726, citing Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 482-83,1998-Ohio-294, 700 N.E.2d 859, 872-73 (Cook, dissenting).
 {¶ 27} The Ohio Supreme Court decision in Williams has been interpreted as having established an exception to the syllabus of ABMFarms, "for situations in which the Ohio Supreme Court views a requirement to arbitrate as unconscionable." Vincent v. Neyer (2000),139 Ohio App.3d 848, 854, 745 N.E.2d 1127. Even if this is true,Williams presents a far different situation than the present case.Williams involved an elderly, low-income plaintiff who was victimized by a fraudulent repair conspiracy between a home equity lender and a "pitchman" for the lender. 83 Ohio St.3d at 464-67.
 {¶ 28} The procedural posture of Williams was somewhat unusual, as the trial court originally denied the lender's motion to compel arbitration without giving a reason for the denial. The denial was then affirmed because the existence of the contract was being challenged. Specifically, the appellate court held that arbitration could not be ordered until the existence of the contract was determined. Id. at 467. Instead of deciding the contractual issue, the trial court refused to consider another motion to compel arbitration, and the matter proceeded to a jury trial, which resulted in a verdict for the plaintiff. Id. at 467-68.
 {¶ 29} On further appeal, the lender challenged the trial court's denial of the motion to compel arbitration. Both the appellate court and the Ohio Supreme Court recognized that the trial court did not specifically decide that the arbitration agreement was unconscionable. Id. at 471. However, the Ohio Supreme Court found that the contract violated the principles of equity under the facts and circumstances of the case, and that the trial court had, in essence, made such a determination. Id. at 472. While explaining this point, the Ohio Supreme Court was careful to distinguish consumer sales contracts from other types of agreements. In particular, the court stressed that:
 {¶ 30} "[t]he trial court was entitled initially to view the arbitration clause at issue with some skepticism. In the situation presented here, the arbitration clause, contained in a consumer credit agreement with some aspects of an adhesion contract, necessarily engenders more reservations than an arbitration clause in a different setting, such as in a collective bargaining agreement, a commercial contract between two businesses, or a brokerage agreement. See, generally, 1 Domke on Commercial Arbitration (Rev. Ed. 1997) 17-18, Section 5.09. When the further complete situation of this case is taken into account, i.e., Williams's evidence regarding the conspiracy between ITT and Blair as the fundamental reason for her entering into the loan agreement in the first place, and also the questionable conditions under which the dispute would be submitted to arbitration as revealed in the record, there is further support for the invalidity of the arbitration clause." Id.
 {¶ 31} Because the present case involves a brokerage agreement, the reservations expressed in Williams do not apply. Furthermore, ABM Farms
also involved a brokerage agreement and the Ohio Supreme Court found nothing unconscionable about the agreement. 81 Ohio St.3d at 499. As we mentioned, the facts in ABM Farms are quite similar to those in the present case. In both cases, the investor explicitly agreed that he or she had read a contract, but actually had not. As we stressed, parties are not misled when they can simply look at or read what they sign. Accord, id. at 502.
 {¶ 32} As a final matter, even if Williams controlled our decision, the record contains no facts that would warrant an equitable result. Accordingly, all three assignments of error are overruled and the judgment of the trial court is affirmed.
Wolff, J., and Donovan, J., concur.