[Cite as *Gallagher v. Cochran*, 2020-Ohio-4917.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

WILLIAM J. GALLAGHER,                   :

    Plaintiff-Appellant,          :

                        No. 109081

    v.                            :

EDWARD W. COCHRAN, ET AL.,              :

    Defendants-Appellees.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** October 15, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-908626

---

### *Appearances:*

Deborah L. Mack, *for appellant.*

Koehler Fitzgerald L.L.C., Christine M. Cooper and Shawn
M. McGraw; and Edward W. Cochran, *for appellees.*

MARY EILEEN KILBANE, J.:

{¶ 1} Plaintiff-appellant, William J. Gallagher ("Gallagher"), appeals the decision of the trial to grant the summary judgment motion of the defendant-appellee, Edward W. Cochran ("Cochran"), as to all five of his claims. Gallagher argues that the trial court erred and that there are genuine issues of material fact.

For the reasons that follow, we find that two of Gallagher's five claims survive the motion for summary judgment. We accordingly affirm in part, reverse in part, and remand.

{¶ 2} This case concerns Gallagher's attempt to recoup over $500,000 dollars, money that he loaned to Barker Products Company ("Barker Products") while he was employed there. Barker Products was an electroplating company that provided national services. Cochran is a business investor who purchased the assets of Barker Products and formed Cleveland Plating. Gallagher alleges that Cochran offered him employment and an equity stake with Cleveland Plating so that he could be repaid over time. Cochran alleges that he made no such agreement and that Cleveland Plating did not inherit the liabilities of Barker Products.

{¶ 3} This case includes numerous narrative threads and many contested facts. For ease of discussion, we begin with Gallagher's entry into Barker Products.

**Facts**

{¶ 4} After resigning from Ashland University as its Track & Field coach in 2005, Gallagher joined Barker Products at the behest of his friend Benjamin Dagley, ("Dagley"). Gallagher had no previous business experience, having worked as the head coach at Ashland for twenty-five years. Despite that, Dagley, who was an athlete at Ashland, wanted to bring Gallagher in to perform managerial tasks. Gallagher began work as a general manager implementing various procedures and performing administrative tasks for the company.

**{¶ 5}** In 2007, Barker Products began to experience severe financial problems. Dagley had wholly leveraged Barker Products with Chase Bank, its secured lender, and Barker Products was in need of capital to address its financial concerns. Gallagher, at Dagley's request, loaned Barker Products over $400,000 over a period of years. He has not been repaid and as of 2014, the interest on his loans in addition to the principal equaled $511,850.

**{¶ 6}** Sometime in early 2014, Barker Product's accountant, Brian Mackert ("Mackert") reached out to Dagley and Gallagher informing them that he knew of a potential investor, Cochran, with whom Mackert had worked previously. Cochran was an experienced business person who had success purchasing failing companies. According to Dagley's affidavit, Mackert had introduced Cochran to Dagley in 2007; Mackert informed Dagley that Cochran had made millions from various deals in which Mackert had assisted Cochran.

**{¶ 7}** On behalf of Cochran, Mackert invited Gallagher and two other Barker Products employees, Elba and Diane Wade, to meet Cochran at Cochran's house on September 9, 2014. Dagley was not invited. At the meeting, Cochran questioned Gallagher and the Wades about Barker Products, and specifically asked about Gallagher's debt. According to Gallagher, Cochran told the group that he was interested in purchasing or investing in the company. Cochran asserts in his affidavit that no contract was made and that he only listened to what the group had to say. In fact, Cochran alleges that it was Gallagher and the Wades who led the discussion.

{¶ 8} Following the meeting on September 9, 2014, Cochran asked Mackert to schedule another meeting for the next day, September 10, 2014. At Cochran's behest, Mackert invited Gallagher, the Wades, and Dagley to meet with Cochran at Crop Bistro, Cochran's Ohio City Restaurant.

{¶ 9} At this meeting, Cochran asked more questions of the group and, according to Gallagher, Cochran indicated that he had decided to purchase or invest in the company. Cochran told the group that he was going to invest in Barker and that the management team would keep their jobs there. He stated that he wanted 60% equity in the company and that the remaining 40% would be divided up however the Barker Products team wanted. Cochran allegedly asked Gallagher to negotiate with Barker Products suppliers to try and secure a reduction in debt and better credit terms in advance of new ownership. Cochran left the team to figure out the equity terms, which Mackert would memorialize and pass on to Cochran.

{¶ 10} Cochran disputes that he was the one making proposals and requesting Gallagher's assistance; Cochran alleges that, much like at the September 9th meeting, he merely listened to what the Barker Products team had to say. He states that he received an equity ownership proposal from the group after the meeting, but that it was the Barker Products team who proposed it. However, in his deposition, he references being involved in the equity discussion, though he stated it was a hypothetical. The Barker team clearly took the discussions with Cochran seriously as they worked with Mackert to prepare a proposal for Cochran's review.

{¶ 11} On September 10, 2014, Gallagher initially asked to be treated as a debtholder rather than have an equity share. The Wades, Dagley, and Mackert agreed to his request. However, after Mackert passed this along to Cochran, Cochran rejected that idea and allegedly told Mackert that Gallagher would have to recoup his debt through an equity share. Mackert shared this information with Gallagher.

{¶ 12} On September 11, 2014, Gallagher spoke with Dagley and the Wades and they agreed that Gallagher would own 33.45% of the company through an equity share, the Wades 6.55% and Dagley zero, consistent with their individual debt with the company. Gallagher shared this plan with Mackert, who stated he would pass it along to Cochran. Mackert told Gallagher that Cochran would agree to this plan because Cochran merely wanted his 60% share and did not care how the other 40% was divided.

{¶ 13} On September 22, 2014, Mackert and Cochran submitted a letter to Chase Bank. The letter stated in part: "Pursuant to a re-organization and or [sic] restructuring of Barker Products Inc. I, Edward Cochran, would like to extend the following offer * * *." In the letter, Cochran offered to satisfy the current debt of Barker Products, as well as satisfy the mortgage. Cochran asked Dagley to sign the letter to give the offer some legitimacy; Dagley complied, believing that he was to be part of the Barker Products team moving forward. Chase Bank did not accept the offer, however.

{¶ 14} There is some dispute as to what actually happened with the letter to Chase Bank. In his deposition Cochran is inconsistent; he states that Dagley did not sign the letter on September 22, 2014, but signed the letter later. He insists, however, that Dagley was only a part of the process to add legitimacy to the offer. Dagley, who had participated in the meeting on September 10 — where the Barker Products team had divided up the proposed equity share — believed that the deal with Chase Bank was consistent with this plan.

{¶ 15} On the same day that Cochran was attempting to purchase Barker Products directly from Chase Bank without involving Gallagher or the Wades, Gallagher received a phone call from Mackert. Mackert told Gallagher that that Barker Products had an overdue bill with The Illuminating Company and that the electrical company had threatened to shut off the electricity unless $10,000 was immediately paid. Mackert asked that Gallagher help out the company. Elba Wade, the production manager, also called Gallagher asking him to make the payment. Gallagher wrote the check, and Wade drove to his house to pick it up. Gallagher made this payment assuming he would be paid back by his employer. However, Gallagher has not been paid by Barker Products since September 10, 2014, and he has not received another paycheck from the company.

{¶ 16} At this point, both Gallagher and Cochran suggest that there was no further communication between the two. In a letter submitted by Gallagher, sent in January 2015, Gallagher asks Cochran whether the Barker Products team is still in

Cochran's plans. Gallagher emphasized that the group was enthused by Cochran's strategy to purchase Barker Products. Cochran never replied.

{¶ 17} Meanwhile, having failed in his initial attempt, Cochran was pursuing different avenues to acquire Barker Products. In October 2014, Mackert introduced Cochran to Kevin Crawford, a customer of Barker Products. Cochran and Crawford decided to purchase Barker and rename it Cleveland Plating. Crawford, Cochran, and Chase Bank came to an agreement where the duo would purchase Barker Products' assets in a secured party sale and purchase the Barker Products property during a foreclosure sale.

{¶ 18} On February 23, 2015, Crawford and Cochran formed Cleveland Plating. On March 13, 2015, Cochran, on behalf of Cleveland Plating, executed a Bill of Sale for $85,000 to purchase the assets of Barker Products. On March 16, 2015, the following Monday, Cleveland Plating began operating at the property under a lease agreement with Barker Products.

{¶ 19} Around this time, Gallagher, who was aware of the sale, reached out via email to both Cochran and Crawford asking about his future employment with the company. Crawford responded that he looked forward to meeting with Gallagher and discussing his role with the company. Gallagher states that this meeting never occurred.

{¶ 20} Gallagher alleges he was in the dark as to his ultimate fate until November 27, 2015, when Gallagher spoke with Mackert. At that point Gallagher

was informed he was not a part of either the ownership group or the management team of Cleveland Plating, formerly Barker Products. He proceeded to file suit.

**Procedural History**

{¶ 21} Gallagher originally filed suit in Wayne County on March 6, 2015, against Dagley. On June 26, 2015, Gallagher won a judgment against Dagley for $1,019,200.00. Gallagher has been unable to collect the full amount from Dagley and is involved in several ongoing actions against him in Wayne County. As a result, Dagley was still a named party in the above action.

{¶ 22} On December 14, 2015, Gallagher sought leave to amend the complaint, having become aware of the operations of Cleveland Plating. Gallagher named Cleveland Plating, Crawford, Cochran, Mackert, and the Wades as defendants. The case was transferred to Cuyahoga County on August 4, 2017, after a lengthy period of discovery, including several depositions, having already occurred under Wayne County's jurisdiction. On June 22, 2018, Gallagher filed a motion to dismiss his claims against Dagley without prejudice. That motion was granted. The case continued until November 13, 2018, when Gallagher filed a notice of dismissal without prejudice of all his claims against Cleveland Plating, Cochran, and Crawford.

{¶ 23} On December 19, 2018, Gallagher filed suit in Cuyahoga County against Cochran and Cleveland Plating alleging five claims:

> Cochran and Cleveland Plating are liable to Gallagher for the sum of $511,850 that was loaned for the benefit of Barker. (Claim One)

Cochran and Cleveland Plating breached their agreement to repay Gallagher through an equity position. Gallagher is also owed $10,000 for the money he advanced to Barker to pay the electrical bill. (Claim Two)

Cochran and Mackert, as Cochran's agent, promised Gallagher employment at Cleveland Plating and an equity ownership interest. Through their actions they also fraudulently misrepresented themselves to Gallagher and he reasonably relied on their promises. (Claim Three)

Cleveland Plating is the successor in interest of Barker Products and Cochran is liable to Gallagher as a result. (Claim Four).

Cochran and Cleveland Plating are liable to Gallagher for civil conspiracy. (Claim Five).

{¶ 24} Gallagher also alleges that Mackert was Cochran's agent in each of his claims.

{¶ 25} On January 23, 2019, the defendants filed their joint answer denying the material allegations of the complaint and raised affirmative defenses, among them a statute of frauds defense. On July 12, 2019, Cochran filed a motion for summary judgment. Gallagher responded on August 12, 2019, and Cochran filed a reply brief on August 21, 2019. On July 22, 2019, Gallagher filed a motion for summary judgment for liability only. Cochran filed a brief in opposition on August 20, 2019, and Gallagher filed a reply brief on August 30, 2019.

{¶ 26} On September 9, 2019, the trial court granted Cochran's motion for summary judgment and denied Gallagher's motion for summary judgment. From that judgment entry, Gallagher appeals the granting of Cochran's motion for summary judgment.

{¶ 27} He has provided one assignment of error.

<u>Assignment of Error</u>

The trial court erred as a matter of law and pursuant to Rule 56 of the Ohio Rules of Civil Procedure in granting Appellees' Motion as there is a genuine issue of material fact regarding Appellees' Motion and Appellees are not entitled to Judgment as a matter of law.

**Standard of Review**

{¶ 28} We review an appeal from summary judgment under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Zemcik v. LaPine Truck Sales & Equip. Co.*, 124 Ohio App.3d 581, 585, 706 N.E.2d 860 (8th Dist.1998).

{¶ 29} Pursuant to Civ.R. 56, summary judgment is appropriate when:

[t]here is no genuine issue of material fact; the moving party is entitled to judgment as a matter of law; and reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor.

*Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus.

{¶ 30} The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

{¶ 31} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v.*

*Eckstein*, 76 Ohio St.3d 383, 385, 667 N.E.2d 1197 (1996). Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992).

{¶ 32} At the outset, we note that Gallagher is only appealing the granting of Cochran's summary judgment motion and is not appealing the denial of his own motion for summary judgment. Many of Cochran's arguments in his brief were responsive only to whether Gallagher's motion for summary judgment should have been denied. As those arguments are not at issue, we will not address them.

{¶ 33} Instead, our task is to determine whether the moving party, Cochran, met his burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. After careful consideration we find that Cochran did not meet that burden as to all of Gallagher's claims.

**Analysis**

**The Statute of Frauds**

{¶ 34} We will begin with a discussion of the statute of frauds and explain why material facts exist that lead us to the conclusion that the statute does not automatically grant Cochran victory.

{¶ 35} R.C. 1335.05 contains Ohio's Statute of Frauds. The statute provides, in relevant part:

> No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person * * * or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is

in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

{¶ 36} Stated plainly, when applied to this case, Cochran cannot have promised to pay Barker Product's debts to Gallagher unless Cochran or Cleveland Plating agreed to that in writing. Neither party suggests that Cochran did agree to assume Barker Products' debts in writing. Cochran argues as a result that all of Gallagher's claims against him fail. However, Gallagher's claims allege not that Cochran agreed to pay him directly, but that Gallagher was promised an equity stake in the company or employment to reimburse him for his debts. As a result, the statute of frauds debt provision is not implicated.

{¶ 37} Cochran also argues more specifically that Gallagher's first claim fails under the statute because those claims cannot be completed in a year. We disagree.

{¶ 38} In Gallagher's first claim he alleges that Cochran promised him he would be repaid over time through employment and an equity share. It is possible for an equity sharehold to be given to a person or to reach the required value in less than a year, therefore the statute of frauds is not implicated. The question of employment requires slightly more analysis.

{¶ 39} Gallagher was promised a lifetime contract by Dagley to work at Barker Products. Cochran argues that Gallagher is asserting Cochran also offered him a lifetime contract, or at least that Cochran agreed to continue employing Gallagher on his lifetime contract. Cochran argues that this supposed oral contract would therefore be void under the statute of frauds. However, neither Gallagher's

complaint nor his affidavit imply that he is alleging Cochran offered him a lifetime position, merely that he offered him a position at Barker Products. Rather than decide whether a lifetime contract fails under the statute of frauds, we instead can say definitively that a period of employment can be completed within a year. The statute of frauds does not bar Gallagher's claim for breach of contract.

{¶ 40} We find that the statute of frauds does not bar any part of the complaint. All other claims concern legal theories not bound up in the statute of frauds. We will next proceed through each claim to determine whether there are genuine issues of material fact. For ease of discussion, we will first examine the question of agency.

**Mackert as an agent**

{¶ 41} At the heart of much of Gallagher's complaint is the theory that Mackert bound Cochran and Cleveland Plating into an agreement to employ Gallagher moving forward as well as provide him an equity share in the company to repay his debts.

{¶ 42} Agency law is well settled. In order for an individual to be an agent, there must be an express, implied, or an apparent grant of authority by the principal. *Master Consol. Corp. v. Bancohio Natl. Bank*, 61 Ohio St. 3d 570, 574, 575 N.E.2d 817 (1991). In this case, there are no issues of fact as to whether Cochran, the principal, expressly or implicitly authorized Mackert to be his agent; Gallagher has also not provided any evidence to suggest that sort of agreement exists. However, there are questions of fact as to whether Mackert had apparent authority.

{¶ 43} The common law doctrine of apparent authority is a form of agency, that focuses on the third party's understanding:

> Even if no actual authority has been given, the principal may be held liable if the principal appeared to give authority to the agent [apparent authority]. A principal may be liable to a third party for the acts of the principal's agent, even though the agent had no actual authority, if the principal has by his words or conduct caused the third party to reasonably believe that the agent had the requisite authority to bind the principal.

*Miller v. Wick Bldg. Co.*, 154 Ohio St. 93, 95-96, 93 N.E.2d 467 (1950).

{¶ 44} The test for apparent authority is whether the complaining party, in this case Gallagher, "acting as a reasonable person, would believe the agent had authority based on all the circumstances." *Young v. Internatl. Bhd. of Locomotive Engineers*, 114 Ohio App.3d 499, 506, 683 N.E.2d 420 (8th Dist.1996), citing *Shaffer v. Maier*, 68 Ohio St.3d 416, 419, 627 N.E.2d 986 (1994).

{¶ 45} We look then to the circumstances surrounding Gallagher, Mackert, and Cochran:

> Mackert introduced Cochran to Gallagher as someone who he had done multiple deals with and someone with deep pockets. Mackert implied that he had been a significant part of Cochran's success on previous deals.

> Mackert worked as an accountant for Barker Products and did some personal accounting for Gallagher. He then seemed to shift towards working more towards furthering Cochran's interests.

> Cochran asked Mackert to set up meetings on September 9, 2014 and September 10, 2014, with Gallagher and other team members from Barker Products.

> Cochran left Mackert alone with Gallagher, the Wades, and Dagley with instructions to discuss dividing up their equity shares of the company.

Gallagher, the Wades, and Dagley discussed how best to divide the company Cochran would purchase with Mackert.

Mackert communicated the initial equity plan with Cochran where Gallagher would be a debt holder; Cochran rejected that plan and Mackert informed Gallagher of that fact.

Mackert then conveyed to Cochran Gallagher's new suggestion that Gallagher be an equity holder. He told Gallagher that Cochran would agree to the new plan because Cochran did not care about how the Barker team divided up their 40% share.

Mackert asked Gallagher to pay the Illuminating Company $10,000 dollars to ensure Barker Products stayed in business, something that Gallagher believed would help Cochran.

Mackert now acts as an accountant for Cleveland Plating.

{¶ 46} Based on these facts alone it is clear that there are genuine issues of material fact as to whether Gallagher, as a "reasonable person", would believe that Mackert was acting as Cochran's agent "based on all the circumstances" involving Cochran and Mackert. With that in mind, we turn to the claims themselves.

**The First Claim**

{¶ 47} Gallagher's first claim alleges that Cochran or Mackert, as Cochran's agent, promised him that he would be repaid over time. As we stated previously this claim survives the statute of frauds because Gallagher is referring to a) a promise of employment and b) a promise of an equity shareholder position. Gallagher is not referring to a strict repayment of another's debt that would violate the statute.

{¶ 48} We find that there are still genuine issues of material fact as to this claim. Gallagher alleges that Cochran and Mackert promised him employment and an equity share. Cochran alleges that it was Gallagher who made proposals asking

for equity and employment. Whether these promises exist, who made them, and whether they are binding promises are some of the questions we are left with from the record as to this claim. These are questions for the finder of fact. Accordingly, we find that this claim survives.

**The Fourth Claim: Successor in Interest**

{¶ 49} As we stated above, there are genuine issues of fact as to whether Mackert was an agent for Cochran. If Mackert was Cochran's agent, then Mackert may have bound Cochran and Cleveland Plating into impliedly agreeing to assume liability through the equity shareholder plan.

{¶ 50} In general, the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation. *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346, 617 N.E.2d 1129 (1993). There are, however, exceptions to this general rule:

> 1) the buyer expressly or impliedly agrees to assume such liability; 2) the transaction amounts to a de facto consolidation or merger; 3) the buyer corporation is merely a continuation of the seller corporation; or 4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 62, 507 N.E.2d 331 (1987).

{¶ 51} There are also factual questions as to whether Cochran's actions implied that he would assume such liability.

{¶ 52} As with the testimony regarding agency, both Gallagher and Cochran present competing affidavits. When confronted with competing affidavits we are

cognizant of a court's role in reviewing summary judgment motions. *See Telecom Acquisition Corp. I v. Lucic Ents.*, 2016-Ohio-1466, 62 N.E.3d 1034, ¶ 93 (8th Dist.). ("When trial courts choose between competing affidavits and testimony, they improperly determine credibility and weigh evidence contrary to summary judgment standards."), citing *Finn v. Nationwide Agribusiness Ins. Co.*, 3d Dist. Allen No. 1-02-80, 2003-Ohio-4233, ¶ 39. These competing affidavits alone prove that there are still genuine issues of material fact as to this question. The narratives offered to this court are incompatible; they also suggest that Cochran could have bond Cleveland Plating to be a successor in interest of Barker Products.

{¶ 53} When Gallagher first met Cochran, Cochran's plan was purportedly to purchase Barker Products and be a 60% shareholder. According to Gallagher, Cochran had two separate meetings with the Barker Products team. At the second meeting on September 10, 2014, Cochran told the team that he would be a 60% shareholder and that he did not care how the rest of the 40% share was divided amongst Gallagher, the Wades, and Dagley. Gallagher, through Mackert, initially proposed that he be treated as a debtholder rather than an equity partner. Cochran, through Mackert, informed Gallagher that a debtholder plan would not work, and that an equity shareholder position would. With this in mind, Gallagher, the Wades, and Dagley proposed a plan to Mackert where they would be equity shareholders and divided the 40% percent as instructed. Again, because of Dagley's debts, he was to have a zero percent share, while the Wades and Gallagher divided up the 40% share. That plan was passed along to Cochran through Mackert.

{¶ 54} Following this meeting, Cochran attempted to "satisfy the debt of Barker Products" and pay Chase Bank. To that end, he had Dagley sign a letter indicating that both parties wanted this to happen. Cochran's actions at this point were completely consistent with Gallagher's understanding that Cochran would be funding Barker Products and that Gallagher and the Wades would receive an equity share following his takeover of the company from Dagley.

{¶ 55} Cochran states that he never agreed to that plan. He also states correctly that he was unsuccessful in satisfying the debt of Barker Products and instead purchased its assets and formed Cleveland Plating. However, Cochran's actions in attempting to satisfy the debt of Barker Products with Chase Bank are consistent with Gallagher's understanding of the equity share proposal that stems from the September 10, 2014 meeting. Gallagher avers that he was promised he would be repaid and that he would be a part of Barker Product's future. Cochran's actions seemed to indicate that this was true, and that his ownership of Barker Products would include an equity ownership stake for Gallagher. It is certainly true that Cochran pivoted to a new plan in October 2014, one that did not seem to involve Gallagher, but by that time Cochran's actions in September — including the potential promises made — may have already implicitly bond Cochran and Cleveland Plating to Barker Products' liability.

{¶ 56} As a result of Cochran's actions, we are left questioning whether Cochran did bind Cleveland Plating; those questions are for the finder of fact to decide.

**Deposition**

{¶ 57} Also informing our decision as to the material fact questions regarding Mackert and the successor theories are the strange circumstances surrounding the deposition of Elba Wade in this case.

{¶ 58} Cochran is a licensed attorney in the state of Ohio. During the course of the proceedings, Cochran has at various stages put himself out as a pro se litigant. However, during the deposition of Elba Wade on November 1, 2016, the following exchange was elicited where Wade stated that he believed Cochran, his boss, was also his attorney. Mr. Halligan represented Gallagher at that time, and Mr. Connick was an attorney who at times represented the Wades and Cochran.

Q. [Halligan]: Did you meet Mr. Cochran in preparation for today's deposition?

A. [Wade]: Yes.

Q. [Halligan]: Did you have discussions with him?

A. [Wade]: Yes.

Q. [Halligan]: Did you deem him to be your lawyer when you're having those discussions?

A. [Wade]: Yes.

MR. CONNICK: Objection.

Q. [Halligan]: You did?

MR. HALLIGAN: So now he's stating, Mr. Cochran, that you represent him as well.

MR. CONNICK: No. Here, let me clarify. Mr. Cochran is representing himself. I'm also representing Mr. Cochran and I'm representing the Wades.

MR. HALLIGAN:  I understand that.

MR. CONNICK:  That's attorney - client privilege and we also have a defense agreement in place, so...

MR. HALLIGAN:  I'd like to see the defense agreement.

MR. CONNICK:  It's not a written agreement. It's one that's in place between us orally. If you want us to put it in writing, I can put it into writing and it will be privileged and you won't see it anyway.

Q. [Halligan]:  Elba [Wade], you met Mr. Cochran, when you met with him he wasn't acting as your lawyer, was he?

MR. CONNICK:  Objection.

MR. HALLIGAN:  What do you mean objection?

MR. CONNICK:  You're asking him to discuss what is confidential attorney-client privilege.

MR. HALLIGAN:  That's not true.

MR. CONNICK:  Yes, it is. And I'm instructing him not to answer the question.

MR. HALLIGAN:  He just said he's pro se, he's not representing anybody else. Therefore, his conversations with Elba are not privileged.

MR. CONNICK:  His conversations with me in the room are all privileged and Elba's not talking about any conversations that were had between me, him, Diane and Ed Cochran that were held at one time, it's not happening.

{¶ 59} As Elba Wade was a witness to the alleged promises Gallagher said Cochran made, his discussions with Cochran are material.  Gallagher's inability to gather information from Wade about these discussions suggests that additional fact-finding still needs to be done in this case.  And, while not dispositive, the potential gamesmanship on display casts a substantial shadow over much of the facts we are

presented with in this record.  We find that summary judgment is not appropriate as to claims one and four.

**Claim Two: Unjust Enrichment**

{¶ 60} We find that Cochran has met his burden at there are no genuine issues of material fact as to this claim.

{¶ 61} Unjust enrichment occurs where "'a person has and retains money or benefits which in justice and in equity belong to another.'" *Smith v. Vaughn*, 174 Ohio App.3d 473, 2007-Ohio-7061, 882 N.E.2d 941, ¶ 10 (1st Dist.), quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20.  The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it.  *Johnson*, at ¶ 21, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954).  Restitution is the remedy provided upon proof of unjust enrichment "to prevent one from retaining property to which he is not justly entitled."  *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957); see also *Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, ¶ 11 (restitution [is] available as the remedy for an unjust enrichment of one party at the expense of another), citing Restatement of the Law, Restitution, Section 9 (1937).

**{¶ 62}** To prevail on a claim for unjust enrichment, a plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant retained that benefit under circumstances in which it would be unjust for him to retain that benefit. *Johnson* at ¶ 20, citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).

**{¶ 63}** Gallagher is alleging that he conferred a benefit on Cochran and Cleveland Plating through his loan to Barker Products as well as his paying the $10,000 electrical bill. However, by Gallagher's own admission, his loans to Barker Products were made before Cochran attempted to purchase Barker. As a result, it cannot be said that Gallagher conferred a benefit on Cochran when he loaned money to Barker Products under different ownership.

**{¶ 64}** Likewise, his $10,000 payment to the Illuminating Company was done to benefit Barker Products, which was not yet owned by Cochran. Mackert told Gallagher that the payment was required to keep Barker afloat; Mackert never stated that the payment was to benefit Cochran. Gallagher states that he made the payment under the belief he would be paid back through the promise of employment or through his equity share. However, Gallagher's belief that Cochran would compensate him for a payment to Barker Products does not mean that Gallagher conferred a benefit on Cochran, or that Cochran retained that benefit. Therefore this payment cannot qualify under a theory of unjust enrichment either.

{¶ 65} As we made clear above, there are still questions of fact as to whether Cochran inherited these debts as a successor in interest. We are simply stating that there are no questions of fact as to the unjust enrichment claim. The court correctly awarded summary judgment as to claim two.

**Claim Three: Fraudulent Misrepresentation**

{¶ 66} In claim three, Gallagher alleges that Cochran, and Mackert as Cochran's agent, knowingly made false promises to him regarding his employment and equity ownership with Barker/Cleveland Plating and that he relied on those promises to his detriment.

{¶ 67} The elements of fraudulent misrepresentation are:

> 1) a representation or, where there is a duty to disclose, concealment of a material fact; 2) the fact is material to the transaction at hand; 3) the representation was made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) the representation was made with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.

*Burr v. Bd. of Cty. Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986); *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984).

{¶ 68} Gallagher argues that Cochran, and Mackert as Cochran's agent, represented that they would employ Gallagher and that he would be an equity partner. Gallagher argues that they made these promises knowing them to be false, and that the promises were made so that Gallagher would rely on them. Gallagher argues that he justifiably relied on these promises, and as a result of his reliance

sustained money damages for $521,850 — the original amount loaned to Dagley with interest and the $10,000 paid to the Illuminating Company. We find that there are no genuine issues of material fact as to the elements of fraudulent misrepresentation.

{¶ 69} First, Gallagher loaned Dagley money well before Cochran allegedly made an offer of employment and equity ownership to him. Therefore, he cannot have relied upon Cochran's promises in loaning the money to Dagley. The only damages Gallagher could have possibly sustained as a result of Cochran or Mackert's promises was the $10,000 payment to the Illuminating Company. However, by Gallagher's own admission, Mackert called Gallagher and asked him to make the payment so that Barker Products would not lose its electricity. According to Gallagher, Mackert did not mention the promise of employment at all. Cochran did not own the company at this point and Gallagher was still employed by Barker Products as then constituted. Nowhere in Gallagher's affidavit is there a clear causal link between Cochran's promises and his decision to pay the electrical bill.

{¶ 70} As a result, we find that there are no genuine issues of material fact and that Cochran is entitled to summary judgment as a matter of law as to claim three.

**Claim Five: Civil Conspiracy**

{¶ 71} Gallagher alleges that Cochran and Cleveland Plating conspired to deprive him of $521,850 and that the company and Cochran acted in a manner to avoid the liabilities they owed him. At this juncture, Gallagher seems to have largely

abandoned this claim, not even mentioning it through the course of his appellate brief. Nevertheless, we will address it here and find that there is no issue of material fact and that this claim fails as a matter of law.

{¶ 72} Civil conspiracy is tort where "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475, 700 N.E.2d 859 (1998), quoting *Kentz v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419, 650 N.E.2d 863 (1995). However, when all the alleged coconspirators are members of the same corporate entity, there are not two separate "people" to form a conspiracy. *See Bays v. Canty*, 330 Fed.Appx. 594, 594 (6th Cir.2009); *Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 2013-Ohio-4417, 999 N.E.2d 241, ¶ 28-30 (6th Dist.), citing *Kerr v. Hurd*, 694 F.Supp.2d 817, 834 (S.D. Ohio 2010), explaining that a corporation cannot conspire with its own agents or employees.

{¶ 73} Here, Gallagher has not alleged any facts that rebut Cochran's argument that he is entitled to summary judgment on this claim. Cochran and Cleveland Plating cannot be coconspirators because they are part of the same corporate entity.

**Conclusion**

{¶ 74} We find that there are no genuine issues of material fact as to Gallagher's second, third, and fifth claims for relief, and that Cochran is entitled to judgment as a matter of law.

**{¶ 75}** We find that genuine issues of material fact remain as to Gallagher's first and fourth claims and that the trial court erred in granting summary judgment as to those claims.

**{¶ 76}** We remand to the trial court consistent with this opinion.

It is ordered that appellees and appellant split costs.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

ANITA LASTER MAYS, P.J., CONCURS;
FRANK D. CELEBREZZE, JR., J., CONCURS IN PART AND DISSENTS IN PART WITH A SEPARATE OPINION

FRANK D. CELEBREZZE, JR., J., CONCURRING IN PART AND DISSENTING IN PART:

**{¶ 77}** I respectfully concur in part and dissent in part with the majority opinion. I do not agree that genuine issues of material fact remain with regard to Gallagher's breach of contract claim (First Claim), and I would affirm the judgment of the trial court with regard to that claim.

**{¶ 78}** Gallagher alleges that Cochran and Mackert, as Cochran's agent, promised him employment and an equity share in the new company. The majority

determined that genuine issues of material fact remain as to whether these promises were exchanged, who made them, and whether they were binding.

{¶ 79} To succeed on a breach of contract claim, a party must prove the existence of a contract, that party's performance under the contract, the opposing party's breach, and resulting damage. *See On Line Logistics, Inc. v. Amerisource Corp.*, 8th Dist. Cuyahoga No. 82056, 2003-Ohio-5381, ¶ 39. I do not believe that Gallagher demonstrated that the parties entered into an agreement upon which a breach of contract claim could be based.

{¶ 80} The formation of a contract requires a bargain in which there is a manifestation of mutual assent, which "ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." *Harmon v. Philip Morris, Inc.*, 120 Ohio App.3d 187, 190, 697 N.E.2d 270 (8th Dist.1997), citing Restatement of the Law 2d, Contracts, Sections 22 and 71. "[M]anifestation of assent may be made wholly or partly by written or spoken words, or by other acts or the failure to act." *Precision Concepts Corp. v. Gen. Emp. & Triad Personnel Servs.*, 10th Dist. Franklin No. 00AP-43, 2000 Ohio App. LEXIS 3322, 5 (July 25, 2000), citing *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631, 691 N.E.2d 303 (4th Dist.1996).

{¶ 81} For a valid and enforceable contract, there must be an offer by one party and the acceptance of that offer by another party. *Alliant Food Servs. v. Powers*, 8th Dist. Cuyahoga No. 82189, 2003-Ohio-4193, ¶ 26, citing *Camastro v. Motel 6 Operating, L.P.*, 11th Dist. Trumbull No. 2000-T-0053, 2001 Ohio App.

LEXIS 1936 (Apr. 27, 2001). "'[F]or there to be a proper offer and acceptance, parties to a negotiation must have a meeting of the minds.'" *Id.,* quoting *Gall v. Trumbull Mem. Hosp.*, 11th Dist. Trumbull No. 99-T-0102, 2000 Ohio App. LEXIS 3053 (July 7, 2000). Parties entering into a contract "must have a distinct and common intention which is communicated by each party to the other." *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.*, 87 Ohio App.3d 613, 622 N.E.2d 1093 (8th Dist.1993). Consequently, "[i]f the minds of the parties have not met, no contract is formed." *Id.*

{¶ 82} The alleged promises between the parties occurred at the September 2019 meetings between Gallagher, Cochran, and several other Barker Products employees. In its recitation of facts, the majority notes that the parties dispute who was making proposals at the meetings regarding Cochran's purchase of the company and the division of the remaining equity in the company. At first blush, this would seem to demonstrate the existence of a genuine issue of material fact. However, regardless of who was making proposals, Gallagher acknowledges that he and the other Barker Products employees ultimately presented a formal proposal to Cochran through Mackert. The initial proposal was rejected by Cochran because Gallagher asked to be treated as a debtholder. The proposal was then changed to give Gallagher an equity share. This revised proposal was given to Mackert who stated that he would pass it along to Cochran. The majority notes that "Mackert told Gallagher that Cochran would agree to this plan because Cochran merely wanted his 60% share and did not care how the other 40% was divided."

**{¶ 83}** There is no evidence in the record as to what Cochran's reaction to the revised proposal was, and this is where the problem lies. "It is axiomatic that the formation of a contract is dependent upon both offer and acceptance and that silence in response to an offer does not generally indicate assent." *Univ. Hosps. of Cleveland v. Lynch*, 96 Ohio St.3d 118, 2002-Ohio-3748, 772 N.E.2d 105, ¶ 62, citing 1 Corbin on Contracts, Sections 3.18 and 3.28 (Rev.Ed.1993); *see also Morganstern, Macadams & Devito Co., L.P.A. v. Hilliard Bldg. Partnership*, 8th Dist. Cuyahoga No. 79407, 2001 Ohio App. LEXIS 5514 (Dec. 13, 2001) (noting that "silence in response to an offer will not constitute an acceptance of an offer, especially if the relationship between the parties justifies an expectation of a reply"), citing *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410 (1978).

**{¶ 84}** Even assuming arguendo that Mackert was acting as Cochran's agent, there is a very significant difference in Mackert stating his belief that Cochran would accept the proposal versus Cochran actually conveying his acceptance. Clearly, both sides understood that Mackert was to take the revised proposal back to Gallagher, which would render Mackert's words of reassurance insufficient to establish acceptance.

**{¶ 85}** Gallagher simply has not presented any evidence that Cochran, through Mackert or on his own, accepted the terms of the revised proposal, and thus, no agreement was ever formed between the parties. There are no genuine issues of material fact as to the breach of contract claim, and respectfully, I would affirm the judgment of the trial court with regard to that claim.